Thank you, Your Honors. I appreciate it. In 1945, there was a tremendous flood on the Red River. And we're not talking about the Red River that's in North Dakota and they're having tremendous problems with it. That's the Central River. But this river originates up in New Mexico, traverses several states. It runs down from Louisiana into the Chippewa Bay, into the Mississippi River, and then back up. We know roughly the history because we've read the briefs. But why isn't there a navigational servitude here that precludes a taking? Yes, sir. With regards to the navigational servitude issue, the government has confessed that it finds no legislative or judicial pronouncement that Saline Bayou is a navigable stream. If it is indeed not a navigable stream, it's not within the jurisdiction of the United States court. But the Red River is. The Red River, yes. And it's the Red River that we're worried about the level of, right? You can't dump your water into the Red River without disturbing the potential navigation. You're absolutely true and correct. They maintain, they have jurisdiction the 12 miles from the river up Saline Bayou to the dam structure that the state has to control my class-related system. That is impossible to negotiate for commercial marine navigation. It's filled with stumps, trees, debris, so on and so forth. It had been used all this time for the drainage of lake complex water into the Red River. Suppose that the Saline Bayou and the Red River had been used to discharge water from Black Creek Lake for the purpose of tower generation. No, it's not tower generation. As far as I understand, it's a hypothetical. Yes. Suppose that had been what the state was doing here. It was using a dam on Black Creek Lake for power generation and that that had been adversely affected by the raising of the water level in the Red River. Yes. Under the Supreme Court cases, would that be compensable? There's a distinction. Your Honor, the case that the trial judge relied on and the court appeal. What's the answer? What's the answer? Yes or no. Would that be compensable? If that were restrictive to that, that would not be compensable. And that was held in the power case of the state of Mississippi, you recall, Your Honor, who contended that after the tributary was raised with the Corps, it impaired the function of the power plant. And therefore, there was a taking involved by diminution of the capability of that power plant. The court said that's not so. And I agree with that decision. So if the discharge here can be used for power generation, then why is there a difference between a discharge for power generation and a discharge for aquatic weed control? Because even as a result of the studies made by the Corps of Engineers, the only way that the Preserve can control that complex of lakes, Your Honor, is to raise and lower the level of those waters so as to kill that ultimately develop this aquatic growth of hydrilla. Today, we have lost the rare plant. I understand that. But you agree there's no way to discharge for power generation? If it was standing. The distinction there, Your Honor, is this. That wasn't a taking, the court said, in the Mississippi case because it was simply a diminution of the power capability of that plant. That's not true in this case. This is a total taking in that it was necessary to lower that water a total of at least 8 foot from time to time to kill that hydrilla. So why is there a right to discharge for weed control but not a right to discharge for power generation? What's the difference? It's the taking aspect under the Fifth Amendment to the Constitution that defines that as a difference, Your Honor. That simply is not a taking, and the court was correct in holding that was another taking. It was simply a diminution. Here we have the taking of the lake complex and destruction of the lake complex as a result of what I deem to be the arbitrary raising to 95 foot. Let me go in, if you'll permit me, into a background. When the court notified the agencies that the river level would be raised from 87 foot to 95 foot, a lot of correspondence were exchanged between my client, the Red River Waterway Commission, the state agencies working with the court, the Louisiana Department of Wildlife and Fisheries, the DOT and the state of Louisiana, as well as the court in New Orleans. The court went on to the Williamsburg District saying, we really anticipate there may be adverse impacts if you raise it to 95 foot. That's not essentially necessary. There are alternatives to this. We ask you to take a look at this and not destroy these lakes. This was understudied by the court, and no definitive final report was ever written. However, ultimately, Colonel Patterson wrote to state and all the agencies the following letter, and it's a record as your Exhibit Chair, that we have studied the issues raised by the state of Louisiana and its agencies, and although our studies have not been finalized, our preliminary studies indicate that there is not going to be any adverse impact on the lake complex of the raising of that. Of course, and that's a record. Of course, we now know that exactly occurred what the state anticipated would occur as a result of this. The alternatives, though, what should I have done to save those lakes? Well, one, Your Honor, they shouldn't have moved the dam site after the original plans and specifications. They found by moving the dam site, they didn't have the nine foot minimum elevation for commercial marine navigation into the river, so they had to raise that water from 87 to 95 foot. The locking dam number three that controls that pool was well under construction. They didn't want to tear it down and redo that, so they hinged that pool, the Corps did, to accommodate this raise belatedly, and that's the only of the five locking dams on the River River is hinged to accommodate the 95 foot. So there's absolutely no question, but the Corps had the ability to do other things to avoid ruining the lakes and thus constitute a Fifth Amendment take. Secondly, Your Honor. Judge Dyke asked you a question which was patterned after the facts of Willow. Is there some way you can fit yourself into the Owen case? Into the Willow case? The Owen case. Oh, the Owen case, yes. That case does give compensation. That case does give compensation, and we suggest Owen is applicable here. However, these cases... Why is it applicable? With regard to Owen... Your Honor, let me have... The difference in Owen, of course, is that the damage occurs above the high water mark where there is no servitude. That's absolutely true. Are you suggesting that's what's happening to you? The Owen case held that erosion occurred above the high water mark. The farmland collapses into the water. Absolutely. And they held that erosion above the high water mark. And so, therefore, there's no servitude in place. Does that fit your circumstance? With regards to the Corps' contention, it does not. With regards to my contention, it doesn't. Isn't it preferable for a claim to preserve the possible flooding claims that you have? To a limited degree. Whatever damage took place by flooding and erosion, that's not preferable. That's correct, to a limited degree. The two distinguishing issues here is the Corps' location of what they call the Federal Navigation Servitude, which, for discussion purposes, they selected the same thing as the ordinary high water mark. Now, let me give you some facts to raise an issue, if you will, in just a moment. In the late 40s and early 50s, following that flood I mentioned, a protected dam was constructed on either side of that lake, high water dam, so that even though the high water of the Red River was confined to that dam, those dams. Back in those days, the farmers even used that dam up to the area of the dam for very valuable land farming purposes. It wasn't until 1981, and remember this project was authorized to the Corporate Congress in 1968, 1981 that the court decided we're going to try to establish this Federal Navigation Servitude in OIMHL or OIMHM, either way you call it. At that time, that land was being used for farming purposes. The high water, ordinary high water, was confined to the lakes. It had been for years and years and years. There's no way any accurate line could be established by the court defining the Federal Navigation Servitude, Your Honor, in 1981. It just couldn't be done. Sadly, they admit that the name Bayou, neither judicially nor legislatively, has been interpreted to be an applicable stream. If it's not an applicable stream, then the court has no jurisdiction over that stream. Well, I can see you arguing you don't fit, you fit into OIMHM because you're above the ordinary high water mark. But it seems like the effect of what happens does affect the water mark. In other words, you have to empty your water into the Red River in order to kill the weeds, and that affects the water level, right? So in effect, even though your property, your lake, lies above the ordinary high water mark, the effect of the change you request would be right below the water mark. Which is? Your Honor, let me explain it this way. In order to accomplish the intentions of the court, the saline bayou must be classified a navigable body of water. Why is that? Is it the Red River that you're affecting here? Because it is affecting the Red River. And I have no case law that I find indicating that non-navigable streams emptying into the Red River, regardless of the type of project, wraps the court jurisdiction over that stream. It can't be navigable because it's incapable of accommodating any sort of traffic up that saline. It's a dangerous bayou. Twelve miles removed from the side of junction of that bayou to the river. How far are you going to allow the court to extend its area of interest from the project? The project was the deepening of Red River so as to make it commercially navigable. That was accomplished. Later, it's now found that the depth of the... But you're asking them to change the water level, which will affect navigation. Let me tell you what they're doing right now, Your Honor, and it's in this budget now. The court has money to deepen the Red River to accommodate that. They could have done that at the time. When that happens, will that solve the problem? No, sir. It won't solve the problem because they're going to continue to maintain that level. And I don't know why they have about $2.8 billion in this budget here that's coming up before Congress to deepen the Red River so as to accommodate, they say, a heavier commercial traffic on the Red. I'm asking as a second guess whether the court made the right decision as to how to change things to improve navigation. That's not the court's judgment. No, you're right. We have to assume that the court was properly acting to make the Red River more navigable. You're absolutely correct, but I suggest it's proper to look at this issue of they certainly were put on notice that this may well happen, and ultimately it did happen, before the elevation was changed. Secondly, there were things the court could have done at that very time to have avoided this occurring, and the state asked them to do that. They never did. Rather, they filed a report indicating the result of their studies. They simply concluded through Colonel Patterson that there would be no measurable effect on the lake complex. Mr. Krugman, you're well into your rebuttal time. Would you wish to say the remainder of it? Oh, I'll tell you what. If time passes, doesn't it fail? Thank you so much, Your Honor, for being with me. We'll save the remainder of your time. Mr. Huff. It's Mark Hayes, Your Honor, for the Department of Justice. Thank you. Mr. Hayes, can I ask a basic question? Why isn't navigation just another public purpose for which compensation is owed? Because it's the founding of the Republic, and navigable waters of the United States have been treated as public property. Well, sure. But that public purpose, that's precisely the sort of thing that you have to compensate for if you take private property for a public purpose. Navigation's a public purpose. Why don't you just compensate for takings that facilitate navigation? Because what's being taken is not private property. It's not a private property. Well, in Owens, they certainly took something, didn't they? Yes. In the interest of navigation. And we didn't find the servitude cognizable. We compensated. That's correct. Because it was above the ordinary high water mark. Right. So it was not within the property that was taken there as vast land. I don't think you have a good answer. I don't think the Supreme Court really answered it and ran. They just said navigation is navigation. We're going to create an exception unless you – I've missed something. I think, Your Honor, that what Willow River and the Supreme Court cases and this Court's cases say is that whatever the – in determining whether there's a property interest. Certainly. And that a riparian does not have a property interest in the flow of a navigable river. It doesn't have a property interest in the use of it or access to navigable waters. Not much for you to change that anyway. Let me ask you a question about why this doesn't fit within Owens. The saline bayou, the clear black lake, lies above the ordinary high water mark of the Red River. Why don't we apply Owens? Well, those issues have been carved out. The Court of Federal Claims Judge Fireskin didn't rule on claims involving flooding or – This isn't a claim of flooding. This is a claim of damage to some property which lies above the ordinary high water mark because the Corps refuses to drop the level of the Red River. So by refusing to drop the Red River, they cause damage above the ordinary high water mark. Why don't we apply Owen? I think that Owen would apply to the analysis of those claims, and the Court of Federal Claims didn't rule on those claims. The ruling here is limited to claims based on the ability to drain the lake by discharging into navigable waters at levels below the ordinary high water mark. So that's the only issue that's before the Court on appeal. The Court left open the issues about harm to lands above the ordinary high water mark. So what you're saying is the right to discharge isn't a property right? Exactly. To discharge at levels below the ordinary high water mark. And that's really the crux of the Commission's claim here. It's not clear whether there's anything else that would be left, but Judge Firestone is giving the Commission the opportunity to raise those other claims. So what's at issue here is just whether there is a property right in the ability to draw down the lakes below the ordinary high water mark. I wanted to respond just briefly to Mr. Crew's comments about sailing by and not being navigable. He said there's been no legislative or judicial determination, I think were his words. There has been an executive determination in the record. The Joint Appendix of Paper 41 was a declaration from Dennis Norris of the Court of Engineers who explains that sailing by has been determined by the Court to be navigable. Does it make a difference? I don't think it does. No, it does not. But I just wanted to be clear. There seems to be another interesting issue here. In almost all of the cases, the other cases, Owen, Willow, Rand, any of them, you have the United States public interest competing with the private interest. We really have a competition of two public interests, don't we? The state's public interest in maintaining its lakes and the United States public interest in navigation on the Red River. Right. That's correct. The Supreme Court cases, Willow River, make quite clear that the United States interest is a dominant interest and navigational servitude is dominant. I don't believe that there are any cases suggesting that the state's interest is equal to or a chunk of federal interest. And I would have won the Civil War. The answer is yes. Yes. Yes, sir. Yes, but irrelevant. Not very relevant. If the states had the primary authority to define their territory as they did before the Civil War, it might be different. I would briefly touch on one other point, which is the whole harmless issue, which we addressed in our brief. The court of federal claims didn't rely on it. And I just wanted to take issue with the assertion in the commission's brief that this was not raised below. It was briefed by the United States below. That's at D.E. 42, pages 16 to 18, and D.E. 46, page 7. And it's not necessary for the court to reach it, but it provides an alternative basis to affirm the CSU's decision. So if there are no further questions, I will sit down. Thank you, Mr. Day. Thank you. I shall be brief, Your Honor. With regards to the issue of old harmless, Judge Feinstein makes no mention of that in her opinion, so it wasn't raised to the truth. As I understand, maybe I'm wrong there, if the trial court fails to rule upon such a motion is presumed denied, in which case it would have been the obligation of the court to have appealed that issue, which they did not. Secondly, They could support the judgment on an alternative ground, but perhaps it would be wiser not to address that issue in court. Yes. That document was executed in 1987, Your Honor. Do you have any rebuttal of Mr. Day's argument? That's it. I'm redundant. That's one point. That was executed in 1987, and it has nothing to do with the razing of the river, which occurred in 1994. And there's no reference in that document to this issue here, so on the benefit of objection, raising it now would urge that it be sent out. One final remark. The government, regarding the navigation of the river in its trial brief, has stated the United States has been unable to locate even a judicial or legislative determination finding the value of saline to be navigable. If it's not navigable, then there's no jurisdiction. Lastly, with regards to this, sir, the Federal Navigation Service, how far can the court extend that from the body of interest? Twelve miles, as in this case? I think, Your Honor, that's grossly unreasonable, particularly where they were placed on none of this stuff. Such measure ought to occur. Thank you, Mr. Phillips. Thank you, Mr. Phillips. Thank you, sir. Case under review.